**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **ROBERT L. HATCHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-24-377-ALM** |
| | ) | |
| **SYLVAIN YANG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried to the court by consent of the parties on June 24, 2026. Plaintiff Robert L. Hatcher and Defendant Sylvain Yang appeared *pro se*. A transcript of the non-jury trial was filed on July 30, 2026. (Doc. 94). Upon due consideration and review of the evidence presented at the bench trial, the court makes the following findings of fact and conclusions of law.

## I. Findings of Fact[1]

At all relevant times, Plaintiff was a man in his seventies. (*Id.* at 15). Plaintiff began receiving Supplemental Security Income benefits in 2021, and he suffers from hypertension, has experienced two heart attacks, and deals with "tremendous stress." (*Id.* at 8-9). Plaintiff takes four different medications for his high blood pressure and an

[1] Several events and contentions related to the relationship between the parties, but unrelated to the claims asserted by Plaintiff, were discussed at the trial. (*See, e.g.*, Doc. 94, at 98-99) (Plaintiff noting issue unrelated to relevant claims). The Court only includes facts relevant to the disposition of Plaintiff's two Fair Housing Act claims in its findings of fact.

antidepressant sleeping pill. (*Id.* at 9). Plaintiff is also recovering from prostate cancer, had surgery on an arm that still causes him problems, and "sometime[s] . . . fall[s]" because of balance issues. (*Id.* at 8-9). Because of his health status, Plaintiff received financial and personal assistance from Hope Community Services, an organization that supports tenants with disabilities (*Id.* at 7-8).

On May 21, 2021, Plaintiff entered into a rental agreement with Defendant ("the May 2021 lease") to rent and live in one unit of the duplex located at 2416 NW 11th Street. (*Id.* at 6-7, 15, 50). Before Plaintiff entered into the rental agreement, a representative from Hope Community Services met with Defendant to discuss Plaintiff's disabilities and to inform Defendant that Plaintiff received Social Security Income benefits. (*Id.* at 7, 13). Defendant testified that he was only made aware of Plaintiff's mental health problems, and not any physical problems, prior to entering into the May 2021 lease with Plaintiff. (*Id.* at 36). While this testimony is partially supported by Plaintiff's concession that he never provided Defendant with a medical report or other documentation describing his physical disability, (*id.* at 21), Plaintiff's testimony that Defendant was nevertheless told about Plaintiff's physical and mental disabilities is slightly more credible. Plaintiff testified that, because of his hypertension, Defendant installed new air conditioning units that kept Plaintiff's apartment cooler. (*Id.* at 13). He also testified that the State of Oklahoma came to the property to "check on" him given this health status. (*Id.*)

Defendant maintained the yard on the property for most of the May 2021 lease. (*Id.* at 9, 27-28). On August 12, 2022, the parties entered into a second rental agreement for the property that became effective on August 15, 2022, and extended until August 14, 2024,

("the August 2022 lease).[2] (Def.'s Ex. 1, at 1). Unlike the May 2021 lease, the August 2022 lease required Plaintiff to "mow, irrigate, and maintain any surrounding grounds, including lawns, shrubbery, and gutters, and keep the same clear of rubbish, trash, weeds, or leaves." (*Id.* at 2).

Plaintiff originally complied with the August 2022 lease's new yard-maintenance requirement. (Doc. 94, at 9). But sometime during the August 2022 lease, Plaintiff hurt his leg and two of his toes and told Defendant he could not and would not do the yard work anymore.[3] (*Id.* at 9, 28-29). Defendant told Plaintiff that yard maintenance was a requirement of the agreement. (*Id.* at 9, 34). As a result, Plaintiff continued to maintain the yard for much of the August 2022 lease. (*Id.* at 26-27). Sometimes he mowed the yard personally, but on four occasions he hired others to mow the lawn for him. (*Id.*) Plaintiff eventually stopped maintaining the yard. (*Id.* at 10). When he stopped, Defendant hired a maintenance crew to mow the property's lawn on about six occasions. (*Id.* at 27-28). Defendant did not specifically ask Plaintiff to maintain the yard before hiring the maintenance crew, speak to Plaintiff prior to hiring the crew, or ask Plaintiff to pay for services the crew rendered. (*Id.* at 28).

The duplex has two parking spaces in the back that connect by a driveway to the

---

[2] The terms of this rental agreement provided that the agreement terminated on August 14, 2023. (Def.'s Ex. 1, at 1). The agreement had an automatic-renewal provision, however, that went into effect and renewed the agreement through August 14, 2024. (Doc. 94, at 79-81, 87; Def.'s Ex. 1, at 6).

[3] Plaintiff states he "think[s]" this injury and subsequent interaction with Defendant occurred in July of 2022, but this date appears incorrect because the parties at that time were not subject to the August 2022 lease's maintenance requirement. (Doc. 94, at 28-29).

street in the front. (*Id.* at 50); (Def.'s Ex. 4, at 1) (image of parking spaces); (Def.'s Ex. 7) (sketch of duplex, driveway, and parking spaces). The two parking spaces are meant to be shared by the duplex's tenants. (Doc. 94, at 50). During his residence at Defendant's property, Plaintiff sometimes had issues parking in the designated spaces behind his home because other tenants would park their cars in the driveway and block access to the parking spaces. (*Id.* at 12, 19). Plaintiff did not inform Defendant that he could not use the parking spaces. (*Id.* at 21, 35-36). However, Plaintiff parked his car in the street until it was struck twice by other drivers. (*Id.* at 14-15, 65). Plaintiff then moved his car to the yard until he received a ticket for parking in the grass. (*Id.* at 15). Plaintiff next elected to park his car in the driveway, but Defendant informed him that the car would be towed if it was not moved off the driveway. (*Id.* at 12-13, 58-59). In a subsequent email exchange between the parties, Defendant explained that Plaintiff was permitted to park in the parking spaces behind the duplex, just not in the driveway. (Def.'s Ex. 4, at 2). Defendant also explained on another occasion that he would talk to another tenant who parked inappropriately. (Doc. 94, at 20).

Plaintiff states that the stress of having Defendant as his landlord during this time caused him to be bedridden and eventually required a trip to the emergency room. (*Id.* at 29). Plaintiff testified that he visited a cardiologist who indicated he should "slow down" because the doctor had noticed a "little something" in his heart. (*Id.* at 30).

In August 2023, Defendant offered Plaintiff a third rental agreement for the property to begin at the expiration of the second, but Plaintiff did not sign it. (*Id.* at 22, 81). The third rental agreement raised the rent on the property and continued to require Plaintiff's

maintenance of the yard. (*Id.* at 75). Plaintiff left the property on August 14, 2024. (*Id.* at 87).

## II. Conclusions of Law

Plaintiff alleged two violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, at trial. His first claim relates to Defendant's alleged refusal to make the reasonable accommodation of providing free yard maintenance at the property.[4] The second claim relates to Defendant's alleged refusal to make the reasonable accommodation of permitting Defendant to park his car in the parking spaces behind his home.

A plaintiff alleging a reasonable accommodation claim under 42 U.S.C. § 3604(f)(3)(B) must show:

1. that the plaintiff or his associate is handicapped as defined by the FHA;
2. that the defendant knew or reasonably should have known of the claimed handicap;
3. that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling;
4. that the accommodation is reasonable; and
5. that defendants refused to make such accommodation.

*Arnal v. Aspen View Condominium Assoc., Inc.*, 226 F. Supp. 3d 1177, 1183 (D. Colo 2016) (citing *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006)); *see also Watson v. Vici Comm. Dev. Corp.*, No. CIV-20-1011-F, 2021 WL

[4] The Court best understands Plaintiff's claim as a demand to neither personally maintain the yard nor hire someone else to maintain the yard. If Plaintiff were simply demanding to not personally maintain the yard (but that he could hire someone to maintain it), the claim would be nonsensical because Plaintiff hired people to mow his lawn on several occasions and there is no evidence that such actions violated the August 2022 lease. Moreover, the relevant provision in the August 2022 lease does not prevent Plaintiff from hiring others to maintain the yard. (*See* Def.'s Ex. 1, at 2). Thus, no accommodation would be at issue unless Plaintiff additionally sought relief from the requirement that he hire others to perform the work.

1394477, at *8 (W.D. Okla. Apr. 12, 2021) (using same test).

### A. Plaintiff Failed to Prove His Yard Maintenance Claim

#### 1. Plaintiff Is Handicapped Under the FHA.

Plaintiff may establish he is handicapped by showing he has "a physical or mental impairment which substantially limits one or more of [his] major life activities." 42 U.S.C. § 3602(h)(1). Applicable regulations provide that physical impairments include cardiovascular disorders or conditions and mental impairments include emotional or mental illnesses. 24 C.F.R. § 100.201(a). "Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Id.* § 100.201(b). "A major life activity is 'substantially limited' if the impairment prevents or severely restricts the major life activity and has a permanent or long-term impact." *Ngiendo v. Pep-KU, LLC*, 2019 WL 3430570, at *8 (D. Kan. July 30, 2019) (citing *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 43 (2d Cir. 2015)).[5]

[5] This definition is adopted from a Supreme Court opinion analyzing similar language in the Americans with Disabilities Act ("ADA"). *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), *superseded by* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Many cases, including *Ngiendo*, apply caselaw interpreting the ADA when resolving FHA claims because of "the similar subject matter and similar definitions in" each. *Haws v. Norman*, 2017 WL 4221064, at *5 (D. Utah Sep. 20, 2017). *Ngiendo* represents the majority view that "major life activities," as well as certain other terms also used by the ADA, should be read alongside the ADA as it was interpreted before its 2008 amendments. *See Watson v. Vici Comm. Dev. Corp.*, No. CIV-20-1011-F, 2022 WL 910155, at *5 (W.D. Okla. Mar. 28, 2022) (defining "handicap" under FHA in accordance with pre-amendment ADA); *see also Warren v. S&S Prop. Mgmt., Inc.*, 2020 WL 5223750, at *4 (N.D. Ga. June 3, 2020) (noting "[m]ajor life activities" is defined more narrowly under the FHA than the post-amendment ADA). *But see McFadden v. Meeker Hous. Auth.*, 2019 WL 652598, at *12 (D. Colo. Feb. 15, 2019) (applying post-

Here, the Court determines Plaintiff has physical impairments including hypertension, a cardiovascular disease, and depression or a similar mental illness. There is evidence that these impairments also substantially limit Plaintiff's major life activities. Plaintiff explained that he was bedridden at one point while living at Defendant's property, evincing a severe restriction on his ability to care for himself. According to Plaintiff, his poor mental health was a factor causing the event, and a subsequent visit with a cardiologist also confirmed that Plaintiff needed to "slow down" based on his heart health. Lastly, the Court is persuaded that both conditions have a permanent or long-term impact based on Plaintiff's testimony that, years after the events of the case, Plaintiff has prescriptions for both his high blood pressure and his mental illness.

The Court does not conclude that Plaintiff's prostate cancer recovery, arm problems, and balance issues qualify as handicaps under the FHA because Plaintiff provided no evidence that they substantially limit any of his major life activities.

Thus, Plaintiff is handicapped under the FHA based on his depression and hypertension.

**2. Defendant Knew About Both Handicaps.**

"The second element requires the plaintiff to show that Defendants knew or should have known of the claimed handicap." *Arnal*, 226 F. Supp. 3d at 1184. This element is met where the plaintiff "communicated the relevant claimed disabilities" to the defendant. *McFadden*, 2019 WL 652598, at *13; *see Arnal*, 226 F. Supp. 3d at 1184-85 (emails and

---

amendment ADA analysis to FHA claim). The undersigned applies the majority view.

forty-five-minute call between parties discussing disability "could lead a reasonable jury to conclude that [the plaintiff] had a disability and [d]efendants' knowledge of the same").

As discussed in Section I, *supra*, the Court concludes that Defendant knew about Plaintiff's mental health condition and Plaintiff's heart condition.

**3. Plaintiff Did Not Demonstrate the Yard Work Accommodation Is Necessary to Achieve an Equal Housing Opportunity.**

This element determines whether the requested accommodation is "necessary (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without." *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 923 (10th Cir. 2012). "An accommodation is necessary when there is evidence showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability" as they relate to the plaintiff's equal enjoyment of their home. *Arnal*, 226 F. Supp. 3d at 1185. "[W]hile the FHA requires accommodations necessary to ensure the disabled receive the *same* housing opportunities as everybody else, it does not require *more* or *better* opportunities." *Cinnamon Hills*, 685 F.3d at 923. "If accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an 'equal,' but rather a better opportunity . . . ." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1226 (11th Cir. 2008).

Plaintiff failed to show that his desired accommodation is necessary. While Plaintiff explained that his leg and toe problems made it difficult for him to maintain his yard, he

insufficiently connected his heart and mental conditions to a request for relief from the requirement that either he or someone hired by him maintains the yard. It is clear to the Court that in this situation, permitting Plaintiff to pay to have his property maintained affords him the same housing opportunity as any other tenant under the rental agreement. If Plaintiff neither had to maintain nor pay for the maintenance of the property, it would provide the type of "better" opportunity that is prohibited by the FHA.

This conclusion is bolstered by a neighboring provision in the FHA. Under 42 U.S.C. § 3604(f)(3)(A), discrimination also includes "a refusal to permit, *at the expense of the handicapped person*, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises." (Emphasis added). Plaintiff has provided no basis to depart from the reasoning, ratified in this nearby section of the FHA, that a landlord is not responsible for the financial ramifications of a tenant's desired accommodation. *See also Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998) (holding that the FHA "addresses the accommodation of handicaps, not the alleviation of economic disadvantages that may be correlated with having handicaps").

**4. Plaintiff Did Not Demonstrate the Yard Work Accommodation Is Reasonable.**

"An accommodation is reasonable under the FHA when it imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens." *Arnal*, 226 F. Supp. 3d at 1185-86. Therefore, "[i]n determining whether the reasonableness requirement has been met, a court may consider as factors the extent to

which the accommodation would undermine the legitimate purposes and effects of" the existing program. *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 604 (4th Cir. 1997). "The determination as to whether an accommodation is reasonable involves a case-by-case, factual inquiry." *Hall v. Hilderbrand*, 2020 WL 1333089, at *7 (D. Colo. Mar. 23, 2020) (citation modified).

For much the same reason that Plaintiff failed to show his desired accommodation is necessary, he also failed to show it is reasonable. Despite the fact-intensive nature of this element, Plaintiff provided scant facts supporting the conclusion that this accommodation is reasonable. The Court concludes that requiring Defendant to provide the yard maintenance when the terms of the rental agreement explicitly place this responsibility on the Plaintiff undermines the legitimate purposes and effects of the agreement and imposes an undue financial and administrative burden on Defendant.

#### 5. Defendant Did Not Refuse to Make Any Requested Accommodation.

Last, a plaintiff must show "that the defendant refused to make the requested accommodation." *Arnal*, 226 F. Supp. 3d at 1186. Before a plaintiff may claim a violation of the FHA, the defendant must have (1) "been given an opportunity to make a final decision with respect to [the plaintiff's] request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law," and (2) denied the request. *Id.*

The Court concludes that Plaintiff did not request the accommodation of free yard maintenance. While Plaintiff stated he wouldn't do the yard work following his injury,

this statement did not operate as a request for free yard work because Plaintiff did not request that Defendant provide the yard maintenance at no cost to Plaintiff. Plaintiff could still comply with all requirements of the rental agreement by hiring others to perform the work, which he did on four occasions. Moreover, when Defendant began hiring workers to mow the lawn, this decision was not based on a request by Plaintiff but instead was done by Defendant on his own initiative.

In sum, Plaintiff has not shown Defendant violated the FHA based on this claim.

### B. Plaintiff's Parking Claim Also Fails.

Unlike Plaintiff's yard-maintenance claim, Plaintiff did not allege any connection, necessary or otherwise, between his handicap and the requested accommodation. Instead, Plaintiff's sole identifiable basis for his parking request is that he wanted to park in a place where his car would not get hit by drivers on the street. The Court cannot find for Plaintiff when Plaintiff plainly failed to "allege any connection between [his] disability and [his] request[ed]" accommodation. *Hall*, 2020 WL 1333089, at *6. The Court independently denies this claim because Defendant never denied Plaintiff the opportunity to park his vehicle in his parking space behind his home. Plaintiff's second FHA claim fails.

## III. Conclusion

Based on the foregoing, it is ordered that the Clerk of Court enter judgment in favor of Defendant as to each of Plaintiff's claims.

**IT IS SO ORDERED** this 10th day of August, 2026.

Amanda L. Maxfield
AMANDA L. MAXFIELD
UNITED STATES MAGISTRATE JUDGE